UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO.  12-268 (JNE/JSM)

      Plaintiff,

v.                                           REPORT AND RECOMMENDATION

JIMMY JOE BARKER (1),
QUENTIN GRAHAM (2),

      The above matter came on before the undersigned upon defendant Jimmy Joe Barker's Motion to Suppress Evidence Obtained as a Result of Search and Seizures [Docket No. 46]; and defendant Quentin Graham's Motion for Suppression of Electronic Surveillance and Wiretapping [Docket No. 48], Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Docket No. 49], and Motion to Suppress Admissions or Confessions [Docket No. 50].

      LeeAnn K. Bell, Assistant U.S. Attorney appeared on behalf of the Government. John F. Wilk, Esq. appeared on behalf of defendant Jimmy Joe Barker, who was personally present; and Steve L. Bergeson, Esq. appeared on behalf of defendant Quentin Graham, who was personally present.  In lieu of testimony, the parties provided to the Court stipulated facts related to the outstanding suppression motions.

      This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

**I. BARKER'S MOTION TO SUPPRESS THE SEARCH OF HIS RESIDENCE CONDUCTED ON NOVEMBER 9, 2010, PURSUANT TO A NO-KNOCK WARRANT.**

Barker has moved the Court to suppress evidence obtained during the execution of the November 9, 2010 search warrant regarding a residence located in Rochester, Minnesota. See Government Ex. 1A. The search warrant at issue allowed law enforcement officers to search for controlled substances, drug paraphernalia, items used for drug distribution, records, items containing electronic media, indicia of occupancy, and weapons. Id., pp. 6-7. The search warrant also authorized an unannounced entry. Id., p. 8. The basis of the unannounced entry was that there was a high risk to law enforcement officers executing the search warrant because firearms had recently been seen at the residence in close proximity to controlled substances and tensions existed between rival gang members. Id., p. 4. In particular, on October 9, 2010, a fight occurred between Barker's gang and a rival gang in Rochester, which reportedly resulted in both groups arming themselves with firearms in case the other group retaliated for the fight. Id. Further, a confidential reliable informant reported that he or she had observed narcotics and firearms at the residence within the previous 48 hours. Id.

Barker's counsel argued at the hearing that the only basis for suppression was that the search warrant for the residence lacked a sufficient showing of necessity to dispense with the knock-and-announce principal under the reasonableness requirement of the Fourth Amendment. In its post-hearing memorandum, the

Government argued that a violation of the knock-and-announce requirement cannot lead to the suppression of the evidence seized, and in any event, the warrant affidavit set forth an adequate and reasonable suspicion that officer safety was at issue.  See Government's Post-Hearing Response to Defendants' Pretrial Motions [Docket No. 72] ("Govt. Mem."), p. 2.[1]

The Fourth Amendment incorporates "the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."  Richards v. Wisconsin, 520 U.S. 385, 387 (1997) (citing Wilson v. Arkansas, 514 U.S. 927 (1995)).  Nevertheless, an unannounced entry is justified "'under circumstances presenting a threat of physical violence,' or 'where police officers have reason to believe that evidence would likely be destroyed if advance notice were given.'"  Id. at 391 (quoting Wilson, 514 U.S. at 936).  Judges may issue no-knock warrants when sufficient cause to do so can be shown ahead of time.  See United States v. Scroggins, 361 F.3d 1075, 1082 (8th Cir. 2004) (citing Richards, 520 U.S. at 396 n. 7).

A law enforcement officer seeking to obtain a no-knock warrant must demonstrate a "reasonable suspicion" that knocking and announcing, under the particular circumstances of that search, would threaten officer safety, be futile, or inhibit the investigation of the crime.  Id. at 1082 (citations omitted).  "However, the showing needed to justify a no-knock entry is not high."  United States v. Weeks, 160

---

[1]     Despite being given the opportunity to do so at the hearing by the Court, neither defendant submitted a post-hearing memorandum in support of their respective motions to suppress.

F.3d 1210, 1213 (8th Cir. 1998) (citation omitted). When making reasonable-suspicion determinations, a court must look at the "totality of the circumstances" of each case to see whether a law enforcement officer had a "particularized and objective basis" for their conclusions. See Scroggins, 361 F.3d at 1081 (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)).

Despite these protections, the United States Supreme Court and Eighth Circuit have held that "[t]he exclusionary rule does not apply to violations of the knock-and-announce requirement of the Fourth Amendment." United States v. Gaver, 452 F.3d 1007, 1008 (8th Cir. 2006) (citing Hudson v. Michigan, 547 U.S. 586,----126 S.Ct. 2159, 2165 (2006)). The Supreme Court concluded that the seizure of the evidence in Hudson was the product of a search conducted as the result of a valid warrant, "not the fruit of the fact that the entry was not preceded by knock and announce." Hudson, 547 U.S. at 601.

As such, even if the search warrant affidavit lacked ample reasonable suspicion that a no-knock entry was necessary for officer safety, such a finding would not result in the suppression of the evidence seized from Baker's residence, given that there is no dispute that the search warrant was based on sufficient probable case that evidence of criminal activity would be found at the residence. Barker's motion to suppress the evidence seized on November 9, 2010 should be denied on this basis alone.[2]

_____

[2]   This Court also finds that the unannounced entry authorized by the search warrant was supported by reasonable suspicion given the confidential reliable

## II.   BARKER'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE TRASH SEARCHES ON OCTOBER 3, 11, and 24, 2012

Barker seeks the suppression of unspecified evidence taken by police officers from the trash collected outside of his residence on October 3, 11, and 24, 2012.  The Government argued that Barker has no standing to challenge the trash he abandoned and thus, a search warrant was not required by the police to search his trash and seize any evidence discovered.  <u>See</u> Govt. Mem., p. 3.

"Police may search trash left outside the curtilage of the house to be picked up by garbage collectors, because the owners of the trash have abandoned it."  <u>United States v. Spotted Elk</u>, 548 F.3d 641, 653-54 (8th Cir. 2008) (citing <u>California v. Greenwood</u>, 486 U.S. 35, 40-43 (1988); <u>United States v. Trice</u>, 864 F.2d 1421, 1423-24 (8th Cir. 1988)).  "[D]epositing garbage in an area for strangers to take, such as the trash collector, removes any possible expectation of privacy."  <u>United States v. Liu</u>, Criminal No. 08-15 (ADM/FLN), 2008 WL 1994977, *13 (D. Minn. Apr. 7, 2008) (citation omitted).  "Even when the garbage is on a defendant's property, as opposed to the public curb, the search and seizure is permissible when the trash is in public view and easily accessible.  As long as the garbage is readily accessible to the public, the Fourth Amendment does not prohibit the search and seizure of the trash."  <u>Id</u>.

---

informant's representations that he or she had been at the Rochester residence within the past 48 hours, during which time he or she observed several firearms at the residence.  <u>United States v. Stevens</u>, 439 F.3d 983, 988-989 (8th Cir. 2006) (finding that a no-knock search warrant was justified based on the presence of the sawed-off shotgun in a common area of the house as reported by a confidential informant); <u>Lyons v. Robinson</u>, 783 F.2d 737, 739 (8th Cir. 1995) (per curium) (recognizing that firearms are tools of the drug trade).

(citing <u>United States v. Comeaux</u>, 955 F.2d 586, 589 (8th Cir. 1992) (internal citation omitted)).

At the hearing, the parties stipulated that trash search by officers had been left at the curb outside of Barker's residence for pick-up and that a non-law enforcement trash collector obtained the trash from the curb and then provided it to law enforcement officers.  Because the garbage was abandoned and placed outside of the residence, thereby making it readily accessible to the public, the warrantless searches of this trash were not prohibited by the Fourth Amendment.  Barker's challenge of these trash searches should be denied.

**III.   BARKER'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE SEARCH OF HIS RESIDENCE ON NOVEMBER 1, 2012, PURSUANT TO A SEARCH WARRANT**

Barker seeks an order suppressing evidence seized from his residence on November 1, 2012, pursuant to a court-issued search warrant, on the basis that law enforcement failed to provide him with the receipt of inventory seized.[3]  The parties stipulated at the hearing that the inventory for the search warrant had been left at Barker's residence with his mother, as Barker had already been transported to jail. The Government argued that officers complied with Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure, given that officers left the inventory at the residence from where the officers had conducted the search and seized evidence, and thus suppression is not warranted.  <u>See</u> Govt. Mem., p. 4.  In addition, the Government

---

[3]     The search warrant and inventory at issue have been marked as Government Exhibit 2.

6

asserted that Rule 41 violations do not mandate suppression in this case because Barker could show no prejudice to him for failing to receive the inventory or that there was a reckless disregard of proper procedure by the officers in this case.  Id.

Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure, provides that, "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.  Fed. R. Civ. P. 41(f)(1)(C) (emphasis added).  "The rule gives the police two options: They may either give the warrant and receipt to the person from whom the property was taken, or from whose premises the property was taken, or they may leave a copy of the warrant and receipt where they seized the item."  United States v. Zacher, 465 F.3d 336, 339 (8th Cir. 2006) (emphasis added).  Failure by officers to follow Rule 41(f)(1)(C) can lead to the suppression of evidence seized.  See United States v. Spenser, 439 F.3d 906, 913 (8th Cir. 2006); see also United States v. Adams, 401 F.3d 886, 893 (8th Cir. 2005), cert. denied, 126 S.Ct. 492 (2005).  However, suppression is not necessary unless the defendant has made showing that he has been prejudiced, or can make a showing that officers acted with deliberate disregard with failing to follow the requirements of Rule 41(f)(1)(C).  See Spenser, 439 F.3d at 913 (citation omitted).

In this case, the officers chose to leave the inventory at the residence from where they seized the evidence and therefore, there is no violation of Rule 41(f)(1)(C).

The fact that officers may have left the inventory with Barker's mother at the residence and she failed to provide it to him is immaterial.  See Zacher, 465 F.3d at 339 ("The police chose the second option and left a copy of the warrant at the FedEx facility. That FedEx failed to relay this information to Mr. Zacher is immaterial.").  Further, Barker has failed to assert any prejudice from not being provided with the inventory and failed to make any showing that the officers acted with deliberate disregard in allegedly failing to comply with the mandates of Rule 41(f)(1)(C).  For all of these reasons, Barker's motion to suppress the evidence seized from his residence on November 1, 2012, pursuant to a court issued search warrant, should be denied.

## IV.    GRAHAM'S MOTION TO SUPRESS EVIDENCE

### A.    Factual Background

As stated previously, on November 9, 2010, law enforcement officers obtained a no-knock search warrant for Barker's residence in Rochester, Minnesota.  See Government Ex. 1A.[4]  The affidavit in support of the search warrant represented that for several months, law enforcement officers had received information from concerned citizens that there had a been a great deal of short term traffic associated with the suspect residence.  Id., p. 3.  In particular, these citizens observed: vehicles arriving at the residence; the occupants entering the premises for a few minutes and then leaving; up to ten different cars coming and going from the residence in a little less

---

[4]    Graham and the Government have stipulated that in lieu of live testimony, the Government's witnesses would testify consistent with the facts as set forth in Government Exhibits 1A, 1B, 1C, which are addressed in this Report and Recommendation.  See Stipulated Facts Regarding November 2010 Search of Defendant's Vehicle [Docket No. 68].

than a half hour; some of the vehicles were observed coming to the residence several times a day; and several of the license plates on these vehicles belonged to individuals known to be involved with narcotics sales.  Id.

In addition to the information from concerned citizens, officers received information that Barker was selling large amounts of crack cocaine in the Rochester area; he sold crack cocaine out of the residence; and he had obtained 2.2 pounds of cocaine that he was turning into crack cocaine for resale.  Id.  The taxpayer listed at the residence was Barker's mother.  Id.  On March 31, 2010, officers conducted a traffic stop of two vehicles.  Id., pp. 3-4.  One of the vehicles was registered to Barker's mother and 15 ounces of cocaine was seized from this vehicle.  Id., p. 4.  The second vehicle was occupied by Barker.  No charges were filed against Barker as a result of this stop.  Id.

Officers also received information that on October 9, 2010, a fight had occurred between Barker's gang and rival gang in Rochester, which reportedly resulted in both groups arming themselves with firearms in case the other group retaliated.  Id.  Further, as stated previously, a confidential reliable informant reported to officers that within 48 hours prior to the search warrant, he or she had observed crack cocaine in sellable amounts worth several thousands of dollars and several firearms (hand guns and a long gun) lying in the open at the residence.  Id.

An hour prior to the execution of the search warrant of the residence, law enforcement set up surveillance outside of the residence.  See Government Ex. 1B

(Supplement Report of Rochester Police Officer Steve Thompson), p. 1. During the surveillance, officers observed an individual, later identified as Graham, exit the residence and enter a white Pontiac Grand Prix, where he was seen opening a glove box and taking an unknown object out. Id. As this was occurring, an officer heard a sound from the area of the vehicle and Graham, which sounded like someone "racking the slide of a handgun." Id. Officers then observed Graham exit the Pontiac Grand Prix and enter the residence. Id. About 10 minutes later, a second individual was observed leaving the residence, entering the Pontiac Grand Prix, searching its glove box and taking out an unknown object, and then opening the trunk of the vehicle, grabbing an unknown item and carrying it back into the residence. Id. Approximately 10 minutes later, Graham was observed leaving the residence, getting into a different vehicle (a red Buick Park Avenue) and driving away from the residence. Id. Officers then executed the search warrant of the residence. Id., p. 2. Three ounces of cocaine were discovered in the residence and a gun magazine with .45 caliber bullets was located in the garage of the residence. Id.

At the scene of the execution of the search of the residence, officers did a limited search of the Pontiac Grand Prix. See Government Ex. 1C (Application), p. 1-5. Officers believed that there was probable cause to search the Pontiac Grand Prix located outside of the residence because two people had been observed coming out of the residence and going into the vehicle, three ounces of cocaine was located inside of the residence, and an officer heard the sound of a gun's slide being racked while

Graham was in the vehicle.  See Government Ex. 1B, p. 2. Consequently, on

November 10, 2010, officers sought and an Olmsted County district judge issued a

search warrant for the Pontiac Grand Prix.  See Government Ex. 1C.  The issuing

judge noted on the warrant that as the application indicated, a limited search of the

vehicle had already occurred and that the warrant was authorizing a more

comprehensive search of the vehicle, including any locked compartments and the

trunk.  See Government Ex. 1C, (Warrant), p. 1-1.  The affidavit in support of the

search warrant incorporated portions of the affidavit for the search warrant of the

residence, as set forth above.  See Government Ex. 1C, (Application) p. 1-3.  The

affidavit also set forth the following additional facts:

> Your affiant assisted Kasson Police Inv Wunderlich with a
> search warrant on 11/09/10 at [XXX], Rochester MN
> 55902. Prior to the execution of the search warrant, law
> enforcement was conducting surveillance on [XXX],
> Rochester MN 55902. During this surveillance, Rochester
> Police Inv Seidel observed a black male wearing a red hat
> walk out of 421 [the residence] and enter a white Pontiac
> Grand Prix, MN 261-BJN at 1830 hours. The vehicle was
> parked across the street and slightly down the block a
> couple of car lengths from [the residence].  This male sat in
> the front passenger seat briefly and then walked back into
> the same residence.  Inv Seidel then observed at 1839
> hours, a male identified as Darrell Lenardo Smith 08/31/72,
> walk out of [the residence] and walk to the passenger side
> of MN 261-BJN.  Smith sat down in the front passenger
> seat of the vehicle briefly and then walked back into the
> house.
>
> Your affiant also heard Rochester Police Inv S. Thompson
> advise that he observed a male [the residence]  and walk to
> MN 261-BJN. From speaking to Inv S. Thompson, this was
> the person Inv Seidel observed wearing the red hat. Inv S.
> Thompson was with Deputy T. Olson at the time this

person was observed going into the car. Inv S. Thompson observed this male in the red hat appear to be in the glove box in front of the front passenger seat and then moving around in the area of his seat. As this male exited the car and walk back into the house, Deputy T. Olson advised Inv S. Thompson that he heard what he believed to be the sound of a semi automatic handgun having a round chambered as this person was walking into the house from the car. Inv S. Thompson aired this on the radio to let other law enforcement officers know what was occurring at the residence.

After the search warrant was executed Inv Wunderlich conducted a Mirandized statement from Darrell Smith. Darrell Smith agreed to speak to Inv Wunderlich. Darrell Smith advised Inv Wunderlich that a guy that was moving - out of the residence wanted clothes taken out to this vehicle, so Darrell Smith said he took some shoe box, box of clothes and a bag of shoes to the white Pontiac Grand Prix. Inv Seidel was told of this information and Inv Seidel advised that he could clearly see Darrell Smith and Darrell Smith did not take anything with him to the vehicle. The occupants of the residence advised that they did not know where the key to the Pontiac Grand Prix was. Law Enforcement was unable to locate the key.

Law enforcement had received information about firearms being inside [the residence]. During the search of the residence, law enforcement did not locate any firearms. However, law enforcement located a "drum magazine" capable of holding 50 to 100 rounds hidden in the residence.

Darrell Smith is currently on parole for controlled substance crimes. Darrell Smith has been convicted of several controlled substance crimes in the past and admitted to be incarcerated in prison on numerous occasions.

The black male with the red hat that was seen going into the Pontiac Grand Prix was not at the residence at the time of the search warrant being executed. Law enforcement is unable to identify him or speak to him about his relationship

with the vehicle and what he was doing in the vehicle prior to the search warrant being executed.

The white Pontiac Grand Prix, MN 261-BJN is registered to Katherine Elizabeth Couture 05/17/89. Katherine Couture has an address of 9288 Our RD Brookston MN listed on her driver's license.

This vehicle, MN 261-BJN, has been used by suspects in a controlled buy in which law enforcement purchased a controlled substance from someone that delivered it in this vehicle.

On 11/09/10 while on scene at the search warrant, a police canine trained in the detection of narcotics conducted a "sniff" of MN 261-BJN. The canine did not alert as detecting narcotics in the vehicle. Due to being unable to locate the keys for the vehicle, law enforcement contacted a tow company to gain entry into MN 261-BJN. Once inside the vehicle, law enforcement searched the vehicle. Law enforcement was unable to open the locked glove box, due to not having a key. Law enforcement was also not able to open the trunk of the vehicle, due to not having a key. Inv Seidel advised that while looking through the vehicle, he observed an aftermarket electronic switch under the steering column and another electronic switch on the left side under panel of the dash. Inv Seidel advised that this could possibly be switches for a vehicle "trap". "Traps" are concealed hideouts in the vehicle in which contraband could be concealed.

Law enforcement is requesting a search warrant to search MN 261-BJN, due to the suspicious activity between the occupants of the house and this vehicle prior to the execution of the search warrant.

Id., (Application) pp. 1-4-5.

The search of the vehicle pursuant to the warrant yielded paperwork belonging to Graham; a grinder and two "SD" cards located in the trunk; a bank receipt from a

Crystal Smith located in the glove box; and a center console insert which contained two plastic baggies with a white powdery substance (later determined to be 124 ounces of cocaine).  <u>See</u> Government Ex. 1C (OSCO Evidence/Inventory).

Graham moved to suppress the initial warrantless search of the Pontiac Grand Prix.  In addition, Graham sought suppression of evidence seized as a result of the execution of the November 10, 2010 search warrant of the vehicle, claiming it is the poisonous fruit of the earlier illegal warrantless search of the car.  The Government responded that under the automobile exception, officers had probable cause to conduct a warrantless search of the Pontiac Grand Prix, given that the vehicle was parked near Barker's residence; individuals from inside the residence, including Graham, entered and exited the vehicle and the residence; during one of these trips, officers heard the sound of a firearm being racked, but did not recover any firearms in the residence; three ounces of cocaine was recovered from the residence, confirming that narcotics were involved; and this vehicle had previously been driven by drug suppliers during a controlled purchase of narcotics by law enforcement.  <u>See</u> Govt. Mem., p. 7.  The Government also argued that Graham has failed to set forth a causal connection between the officers' alleged illegal conduct and the fruits of that conduct and that even if the only evidence obtained from the warrantless search of the vehicle—the observation by officers of the aftermarket switches in the vehicle—was excised from the supporting affidavit, it would not negate probable cause for the issuance of the search warrant under an "independent source" theory.  <u>Id.</u>, at pp. 8-9.

**B.** **Analysis**

    1.    **Warrantless Search of the Vehicle**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures. U.S. Const. amend. IV; see also Illinois v. Gates, 462 U.S. 213, 230, 235 (1983). A warrantless search violates the Fourth Amendment unless an exception to the warrant requirement applies. Katz v. United States, 389 U.S. 347, 357 (1967). The automobile exception to the warrant requirement permits a warrantless search when there is probable cause to believe the vehicle contains evidence of illegal activity. See United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008); see also United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011) (quoting United States v. Davis, 569 F.3d 813, 817 (8th Cir.2009), quoting United States v. Cortez–Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam)) ("'One such exception is the automobile exception, which allows law enforcement to 'search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'"). This exception is justified by the easy mobility of automobiles as well as the reduced expectation of privacy associated with motor vehicles. Blaylock, 535 F.3d at 926.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d

1083, 1085 (8th Cir. 2000). "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003) (marks and citation omitted).

This Court finds that officers had sufficient probable cause to conduct the initial warrantless search of the Pontiac Grand Prix. Officers had received a search warrant for narcotics and firearms located in the Rochester residence. Prior to the execution of the search warrant of the residence, officers observed the Pontiac Grand Prix outside of the residence, which they recognized was a vehicle that had been previously used to deliver narcotics during a controlled buy. Officers also observed two individuals leave the residence and enter the Pontiac Grand Prix, during which time each of them looked through the glove compartment, and saw one of them grab something from the trunk. Officers then observed the individuals go back inside the suspect residence. Additionally, an officer heard a noise from the area of the vehicle, where Graham was seated, that sounded like someone was "racking" the slide of a semi-automatic handgun. Further, during the execution of the search warrant of the residence, officers located cocaine and a "drum magazine" capable of holding 50 to 100 rounds, with .45 caliber bullets inside, but no firearms. The Pontiac Grand Prix had been connected to a previous controlled buy of narcotics; the vehicle was tied to individuals who had gone to and from the vehicle and the suspect residence where narcotics and

16

ammunition were found; and there was an unaccounted firearm. On these facts, the Court concludes that based on the totality of the circumstances, a reasonable person would have believed that there was a fair probability that evidence of narcotics or firearms could be found in this vehicle. As such, the Court finds that the warrantless search of the Pontiac Grand Prix did not violate the Fourth Amendment.

## 2. November 10, 2010 Search Warrant

Even if the Court had found that the warrantless search of the Pontiac Grand Prix violated the Fourth Amendment, it does not conclude that the evidence seized pursuant to the search warrant should be suppressed.

Searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. Gates, 462 U.S. at 236. Hearsay evidence is allowable for this purpose. Gooding v. United States, 416 U.S. 430, 439 n. 6 (1974). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238 (emphasis added).

In reviewing this decision of the issuing court, the duty of this Court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed. Id. at 238-39 (citation omitted). As stated previously, "[p]robable cause exists when, given the totality of the circumstances, a reasonable person could believe

there is a fair probability that contraband or evidence of a crime would be found in a particular place." <u>Fladten</u>, 230 F.3d at 1085.

The exclusionary rule under the Fourth Amendment "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." <u>Segura v. United States</u>, 468 U.S. 796, 804 (1984) (marks and citations omitted). "However, the exclusionary rule is inapplicable when the connection between the constitutional violation and the evidence to be excluded is 'so attenuated as to dissipate the taint.'" <u>United States v. Swope</u>, 542 F.3d 609, 613 (8th Cir. 2008) (quoting <u>Nardone v. United States</u>, 308 U.S. 338, 341 (1939)). This includes situations where the Government can demonstrate the evidence supporting the issuance of a search warrant "was acquired through a source independent of the taint." <u>Id.</u> (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 487 (1963). The two following questions must be answered in the affirmative for the independent source doctrine to apply: "<u>first</u>, would the police have applied for the warrant had they not acquired the tainted information; and <u>second</u>, do the application affidavits support probable cause after the tainted information has been redacted from them." <u>Id.</u> at 613-14 (citing <u>Murray v. United States</u>, 487 U.S. 533, 542 (1988)). As to the second prong, the test is whether "removing the tainted information also removes the basis for probable cause." <u>Id.</u> at 614.

The only possibly incriminating evidence from the warrantless search of the Pontiac Grand Prix that was included in the affidavit in support of the vehicle search warrant, were the observations of electrical switches that could have been used for secret compartments. <u>See</u> Government Ex. 1C, p. 5.

As to whether the law enforcement officers would have applied for the warrant had they not acquired the information of the electric switches, the affiant of the affidavit in support of the search warrant represented that law enforcement was requesting a search warrant, "due to the suspicious activity between the occupants of the house and this vehicle prior to the execution of the search warrant." <u>Id.</u> Further, while the affidavit mentioned the switches, the affidavit also set forth that officers had observed two individuals opening the glove compartment and one who opened the trunk of the vehicle, but that officers could not access the glove compartment or the trunk because they did not have the key to the vehicle. <u>Id.</u> In other words, even without references to the switches, it is evident the officers wanted to conduct a more thorough search of the vehicle, including the locked glove compartment and trunk that they could not open during the warrantless search. Thus, the Court finds that law enforcement officers would have applied for the warrant even if they had not acquired the information regarding the electric switches.

As to the second question, the Court finds that probable cause still exists for the issuance of the search warrant for the Pontiac Grand Prix even if all mention of the aftermarket electronic switches and traps were excised from the supporting affidavit.

The supporting affidavit set forth that officers had received tips from concerned citizens regarding a great deal of short-term traffic to and from the Rochester residence that was the subject of the November 9, 2010 search warrant, involving individuals that law enforcement determined to be individuals known to be involved with narcotics sales; information that Barker was selling large amount of crack cocaine and had recently obtained 2.2 pounds of cocaine; and information from a confidential informant who reported seeing sellable amounts of crack cocaine and several firearms in the open at the suspect residence. See Government Ex. 1(C), pp. 2-3. In addition, the affidavit set forth the results of the officers' surveillance of the suspect residence including: observing the Pontiac Grand Prix outside of the suspect residence, which officers recognized was a vehicle that had been previously used to deliver narcotics during a controlled buy; observing two individuals (including an individual who was at that time on parole for controlled substance crimes) leave the suspect residence and enter the Pontiac Grand Prix, during which each of them looked through the glove compartment, and one of them grabbed something from the trunk; shortly after observing these individuals return to the suspect residence; and hearing the chambering of a round of ammunition into semi-automatic handgun. Id., pp. 4-5. Moreover, the affidavit contained the results of the execution of the search warrant of the residence, which included a "drum magazine" capable of holding 50 to 100 rounds, but no firearms. Id., p. 4. In sum, the affidavit linked the vehicle and occupants to a residence for which there was probable cause to believe drugs and weapons could be

20

located, and where an ammunition clip and narcotics were ultimately found. All of this information provided sufficient probable cause, even without the mention of any electronic switches or traps, for the issuance of the search warrant for the Pontiac Grand Prix.

### 3. Conclusion

For all of the reasons stated above, the Court finds that Grahams' motion to suppress evidence seized as a result of the searches of the Pontiac Grand Prix should be denied.

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

IT IS RECOMMENDED that:

1. Defendant Jimmy Joe Barker's Motion to Suppress Evidence Obtained as a Result of Search and Seizures [Docket No. 46] be **DENIED**;

2. Defendant Quentin Graham's Motion for Suppression of Electronic Surveillance and Wiretapping [Docket No. 48] be **DENIED** as moot based on the Government's pre-hearing response to defendant's motions and the representation of defendant's counsel at the hearing;

3. Defendant Quentin Graham's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Docket No. 49] be **DENIED**; and

4.    Defendant Quentin Graham's Motion to Suppress Admissions or Confessions [Docket No. 50] be **DENIED** as moot based on the Government's pre-hearing response to defendant's motions and the representation of defendant's counsel at the hearing.

Dated:        March 25, 2013

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April, 8, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **April, 8, 2013**.